UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:19cr134 (KAD) |
| | : | |
| v. | : | |
| | : | |
| LAQUASIA SAMMS | : | March 24, 2023 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in aid of sentencing. The defendant, Laquasia Samms, stands convicted of making False Declarations Before the Grand Jury, in violation of 18 U.S.C. § 1623. The defendant is facing a maximum penalty of five years imprisonment, a fine of up to $250,000, and a period of supervised release of up to three years. In considering an appropriate sentence for the defendant, the Government recognizes that the defendant has no prior criminal record, is a mother to two children and has a strong work history. However, based on the defendant's blatant disregard for the truth-seeking function of the Grand Jury and her willingness to perjure herself rather than aid in the apprehension and prosecution of an individual that murdered three young men in a single evening, some meaningful consequence is warranted. The Government submits that an appropriate sentence should include at least some period of incarceration to reflect the statutory factors applicable in a criminal sentencing.

## I. THE OFFENSE AND RELEVANT CONDUCT

The facts underlying the conviction are set forth in the U.S. Probation Officer's Presentence Report ("PSR") and include the events that occurred on the night of November 16, 2015, as well as Ms. Samms' perjury before the Grand Jury which was investigating those events. In particular, the investigation involved a double homicide which occurred on Mix Avenue in Hamden, CT, where the two victims, Damian Connor and Tamar Lawrence, were found deceased in a parked

car.  Connor died from a single gunshot wound to the head and Lawrence from four gunshot wounds to the head.  On the same night, New Haven Police responded to a 911 call at Sherman Court, where Devante Williams was found dead as a result of multiple gunshot wounds.

The investigation revealed that on November 16, 2015, Edward Michael Parks, was inside the 2nd floor apartment located at 21 Shelton Avenue in New Haven, CT, and was engaged in the attempted distribution of firearms which he had brought to CT from North Carolina.  Parks was dating T.C. and lived at 21 Shelton with T.C. and her family, including Laquasia Samms.  On the date in question, Parks was in possession of multiple firearms that he was trying to sell and met with multiple prospective buyers at 21 Shelton Avenue.  The buyers included E.G., R.C. and the victims, Damian Connor and Tamar Lawrence.  In addition to the buyers, there were a number of other people at the apartment, including the defendant, Ms. Samms.

While Parks was showing off the guns to the potential buyers, E.G. took two firearms from Parks and left without paying for them.  Parks realized his guns were stolen and became upset. He informed the eventual victims, Damian Connor and Tamar Lawrence, that they were not going anywhere until he got his guns or the money.  The situation became chaotic with multiple individuals making calls to E.G. trying to get him to come back.  E.G. received frantic calls from Samms' brother, who was also present at 21 Shelton, trying to get him to come back. At Parks' behest, multiple phone calls were made to E.G. to try to get him to come back with the guns, in some of the calls the victims were begging E.G. to return with the guns.

Parks, who was observed by witnesses with two firearms in his possession, implied that he would harm the decedents, Connor and Lawrence, if the firearms were not returned, and Parks would not allow them to leave the premises. At some point, the victims were moved to a back

2

porch area off the apartment, where they were searched and their money and cellphones were taken.   Devante Williams, Rayquan Carr and J.C. were all present at that time.

While these events were transpiring at the apartment, Ms. Samms was present and was texting her best6 friend, Q.B., who was the girlfriend of E.G.  Those texts were retrieved from Q.B.'s telephone shortly after the murder when she consented to having her cellular telephone searched by police.  The texts revealed that Ms. Samms had intimate knowledge of the events taking place at 21 Shelton Avenue and that Connor and Lawrence were being held against their will. Ms. Samms also told Q.B. that Parks was making threats about coming after Q.B. because she was dating E.G.

In one text, Ms. Samms told Q.B., "He talking bout he know where everybody live he got until a certain time."  In another text, she wrote, "Tell me why they took all chicken money." (Chicken was Damien Connor's nickname). During this series of text communications, a text was recovered from Q.B. to Ms. Samms which was as follows:

> "That's what I said to bro, That shit shouldn't went down there anyways Smh now got ppl in a Fucked situation smh that's messed up … I have to drive in that fucking car… E don't know who lee know he can mention that shit to anybody and like when he come here I'm gonna go so FUCKING crazy It's not even funny … Like I said to vonte he wouldn't even let no shit go down like that near Nicole car or Nicole friends house … Like FOH … that's Grimmy, Dead wrong, Fucked up & Shiesty All in one & not giving a Fuck about nobody else but his self."

The context of this text from Q.B. to Ms. Samms makes clear that both parties know what "E" (E.G.) did (which was steal guns from Parks at Ms. Samms' house) and are angry that E.G. would be so selfish to do this and put others at risk. Q.B. specifically notes that "E" does not know who

Lee knows, suggesting that Lee is the aggrieved party and might retaliate against E.G. and those close to him.

During the same time period Q.B. was also texting E.G., asking him where he was and relaying information she had received from Ms. Samms.  In one text, Q.B. wrote, "Quasia just spazzed on him like Tay don't nothing to do with nothing don't go to her house with that shit."  In this text, Q.B. was telling E.G. that Laquasia had "spazzed" on Parks because Parks was talking about going after Q.B.  In a similar text, Q.B. told E.G., "That nigga talking crazy, like I know where everybody live, Tell that nigga I'll take his baby mother & hold her until I get my shit."  This text, as interpreted, was Q.B. telling E.G. that Parks was "talking crazy" and saying that he knows where people live and was telling someone to tell E.G. that he knows where Q.B. lives and he will come kidnap her until he gets his guns back.  It is important to note that Q.B. was at home and was learning of things that Parks was saying because Ms. Samms was telling her.

Despite Parks tirade, E.G. refused to return with the guns or money for the guns, Parks indicated to his associates and the victims that they parties would be going for a ride.  The evidence developed during the course of the investigation was that Parks got into Connor's car along with Connor, Lawrence and Rayquan Carr.  Parks directed J.C. to follow in another car in order to give him a ride.  J.C. took Ms. Samms' vehicle, which she was aware of, and was accompanied by Devante Williams.  Ultimately, J.C. drove Ms. Samms' car to Mix Avenue, where he picked up Parks and Carr, immediately after Parks shot and killed Connor and Lawrence.  After the murder, J.C. drove Ms. Samms' vehicle back to 21 Shelton Avenue, where he got out of the car.  Rayquan Carr then drove Ms. Samms' car to Sherman Court, along with Parks and Devante Williams, where Parks shot and killed Devante Williams.

The day after the murders there were text messages between Q.B. and Ms. Samms, about getting rid of Ms. Samms' car, which revealed that she had knowledge of the events that took place on November 15, 2016, and she knew that her car had been used during the course of the kidnapping and homicides. The text messages also revealed that Ms. Samms was very upset about what was occurring, and what had occurred, and noted that she felt "guilty."

Despite Ms Samms' obvious knowledge about the events that took place, when she met with police on November 24, 2015, she provided very limited information about what had occurred.  She was subpoenaed to testify before the Grand Jury on February 7, 2017.  In lieu of testifying, counsel (Michael Dolan, Esq.) was appointed for her.  She reappeared before the Grand Jury on February 22, 2017, and asserted her Fifth Amendment rights, and was excused. Authorization for a compulsion order was sought and obtained, and Judge Arterton entered the order on or about March 18, 2019.  On March 19, 2019, having been compelled to do so, Ms. Samms testified before the Grand Jury.  That testimony is the subject of the instant offense.

Ms. Samms was warned about perjury, which included not providing complete testimony, specifically, that a false failure to recall was still a false statement.  Notwithstanding those warnings, Ms. Samms testified to a failure of recollection on a number of critical issues both as to text messages and the underlying events, which any person would recall.  Ms. Samms testified that this was the only time that three people who had been in her house had been murdered. Nonetheless, she testified that she could not remember critical events and facts which had occurred that evening, including conversations she engaged in where she revealed what was going on at her home, the disposition of her vehicle, the payment of money by the victim to Parks, who else was in the apartment, the fact that the victims appeared to be held against their will, and threats made by Parks through Ms. Samms against Q.B. if the firearms were not returned.

Ms. Samms' testimony was inconsistent with the text communications taken from Q.B.'s phone. To this end, Q.B., who was real-time texting with Ms. Samms that evening and thereafter, testified before the Grand Jury that she had specific recall of the texts. She also testified that she and Ms. Samms spoke after the incident and, significantly, she noted that Ms. Samms told her that she was not going to cooperate with the police.

On or about April 24, 2019, the Government spoke with Ms. Samms' attorney, Michael Dolan, Esq. to advise Ms. Samms of the potential for perjury charges and to give her the opportunity to correct her previous testimony, which was clearly untrue. Ms. Samms did not wish to avail herself of that opportunity.,

Later, after her indictment, Ms. Samms sat down with the Government and was somewhat more forthcoming. She admitted to certain facts about the events of November 16, 2015, but was not totally forthcoming and did not provide a complete accounting of what she knew. In the lead up to the trial of Edward Michael Parks, the Government met with Ms. Samms to potentially call her as a witness at trial. Ms. Samms continued to refuse to provide a fulsome account of what she witnessed on the night Parks kidnapped and later killed Damien Connor and Tamar Lawrence, and then killed Devante Williams.

## II.    <u>SENTENCING GUIDELINES</u>

The plea agreement executed by the parties and the Presentence Report ("PSR") issued by the U.S. Probation Office both agree that the defendant's base offense level is determined pursuant to U.S.S.G. § 2J1.3(c). Under that provision, since the offense involved perjury with respect to a criminal offense, U.S.S.G. § 2X3.1(Accessory after the fact) is applied with respect to that offense. Since the offenses of Murder in the First Degree and Kidnapping both carry offense levels in excess of 30, the defendant's Base Offense level is 30. Three levels are subtracted for acceptance of

responsibility, resulting in a total offense level of 27.  At Criminal History Category I, the guideline sentence is the statutory maximum term of 60 months imprisonment.

### III.   LEGAL STANDARD

As the Court is aware, after the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 549 U.S. 882 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).  The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a).

### IV.   DISCUSSION

#### A.  Seriousness of the Offense

The defendant has committed a serious offense and though it is not in itself a dangerous or violent offense, it is the type of offense that allows such things to flourish in our cities.  The

defendant had information that could have helped investigators move forward with the investigation and potentially make an arrest of a genuinely dangerous human being.  Instead, Ms. Samms chose to be absolutely defiant.  The defendant's sentencing memorandum suggests that Ms. Samms' perjury and her subsequent refusal to tell the Government what she knew was based on fear.  That she lacked the bravery to testify against a dangerous man.  Knowing what Parks did, it would not be unreasonable to be fearful of him. It may be that deep down Ms. Samms was fearful. However, Ms. Samms never expressed any fear about Parks or about testifying against him.  She exhibited defiance. She refused to cooperate in nearly any respect and showed no appreciation for what it means to take an oath to tell the truth.  She had no qualms about lying to the Grand Jury and lying to the Government.  When individuals have no respect for the justice system and lack a willingness do to the right thing, it allows crime to flourish.

### B.  History and Characteristics of the Defendant

The defendant has essentially no prior criminal history, minus a motor vehicle case. Despite a tumultuous upbringing, Ms. Samms seems to have been a good student and to have taken advantage of educational opportunities to complete a medical assistant program.  She has a strong work history.  While she has not stayed at any one job for very long, she is always working and seems to be doing her best to provide for her family.  Ms. Samms has made poor choices for partners, as both of her children's fathers are individuals well-known to law enforcement. The father of Ms. Samms' youngest child is a known gang member, who has been involved in gun crimes.  Neither partner seems to offer her much support and she is the primary caretaker for her children.

### C.  Deterrence, Protection of the Public, Promote Respect for the Law

A term of imprisonment serves the goals of providing adequate deterrence and promoting respect for the law.  As indicated above, the Government is cognizant of the fact that Ms. Samms is a mother and does not have a tremendous amount of support from the children's fathers. A prison sentence will not be easy for her or her children.  However, there has to be some penalty for the utter refusal to tell the truth before the Grand Jury.  The system cannot function effectively if people think they do not have to tell the truth when called upon to do so. If there were to be no consequence, the message sent to the community would be just that, you can lie to the Grand Jury and face no real consequence.

## V.     **CONCLUSION**

For the reasons stated herein and on the full record of this case and an assessment of the factors outlined in 18 U.S.C. § 3553(a), the Government respectfully submits that in light of the nature of the offense, the defendant's minimal criminal history, personal history, including her acceptance of responsibility, and the need for the sentence to provide just punishment, respect for the law and to deter the defendant and others from engaging in similar criminal activity, the sentence which is sufficient but not greater than necessary to accomplish those various sentencing goals is a sentence which includes a period of incarceration.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/ *Reed Durham*
REED DURHAM
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct29959
450 Main Street
Hartford, CT 06103
(860)760- 7969

<u>CERTIFICATION</u>

I hereby certify that on March 24, 2023, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Reed Durham*
REED DURHAM
ASSISTANT UNITED STATES ATTORNEY